May it please the Court, good morning Your Honor, Steve Sanfilippo for Appellant Continental Motors, Inc. In order to prevail on his breach of express warranty claims against Continental, Appellee Ronald Becker had to prove the following, he had to prove that Continental, that an engine component or part manufactured or supplied by Continental contained a defect in material or workmanship and he had to prove that Continental refused to repair or replace any such defective engine component or part. We would respectfully submit that the evidence is insufficient to support a finding on either of those essential elements and for that reason. Well, so something was wrong with that engine, wasn't there? There is no doubt something was wrong with the engine, the problem is they can't figure out what was the cause of the problem. So why do you, I mean, what's your best case for saying you have to prove the precise cause? I think our best cases are the Nissan Motors, Mack Trucks, and Cooper Tire, which are all admittedly product liability cases, but then if you look at the Leifester case, which we have out of the Texas Court of Appeals in Austin, it is a breach of express warranty case. It involves having to prove that there is a defect in material or workmanship and it relies upon the fact that you can't simply point to a product failure to say that that product failure was caused by a defect in material or workmanship.  And on that note, while we're on it, I would, last night they filed a 28-J letter citing a case out of the Houston Court of Appeals, the Curry International case. It actually is about the same as the Plastex case they had already cited. Both of them are breach of the implied warranty of merchantability cases, in which case for defect all you have to show is that the product is not fit for its ordinary use. That's a very different scenario than having to produce evidence of a specific cause, i.e. a defect in material or workmanship. Well, someone from Continental examined the engine at some point and thought there were problems. I don't know that anybody thought there were problems. They took the report. Mr. Becker took his aircraft into Dugash for routine maintenance. No, but after all this arose, Continental sent somebody out there. There was oil coming out the tailpipe. There was oil in the spark plugs. That was actually their expertise. We sent a guy out there who went and looked at the cylinders 14 months after the aircraft had stopped being worked on and after suit was filed. He found corrosion in the cylinders, but as he testified, the corrosion in the cylinders was from sitting too long without having been properly preserved. It had remained idle for 14 months. In fact, Mr. Sherman, who's Dugash's... There was lots of evidence that something was wrong with the plane, and specific things were wrong. No doubt. That's a fact question, and that got resolved against you, it seems to me. There was a lot of evidence of problems. The types of evidence were the engine is running rough, the spark plugs are fouling, burning oil. No doubt that is all evidence of a problem, but that's not evidence of what is causing that problem. Under Texas law, if you don't have evidence of what is causing that problem, that is essentially no evidence. Whether it's one element, such as running rough, or five different systems, such as running rough, spark plugs fouling, as the Supreme Court said in Nissan, a lot of no evidence is still no evidence. Your client did undertake twice to repair the cylinders under warranty works. It seems to me there's some admission that there was a warranty claim here. There was no doubt a warranty claim. And that you all did warranty work on the cylinders twice. We did troubleshooting work as we were required to do under the terms of the law. I thought you sent cylinders twice to replace cylinders twice. We repaired cylinders twice. When they called in with a, we have a fuel consumption issue, our starting point for the cylinder, send them to our folks, we'll look at the cylinder. And they did that twice as warranty work? They did it twice. Both times. They repair the cylinder, they send them back, Dugash's folks won't follow the break-in procedure. There's a specific break-in procedure once you put replacement cylinders in there. You say they did it twice, but Judge Owen said as warranty work, it was assigned a warranty claim number and treated as a warranty on two occasions. Is that not correct? It was subject to the warranty claim, no doubt. Well, right. But the thing that puzzles me in addition to that is that in January of 2013, it's tendered again for repair and there's an exchange involving signing a document where the plaintiff, I believe the plaintiff in this case, has to authorize services or repair work, and I'm And also expressly creates a mechanics lien, which sounds at some point like what was considered to be warranty work suddenly turns into work that's not warranty work. It's not. As Continental's warranty director testified, what he told Mr. Becker was, if the repairs, if our troubleshooting determines that these repairs are not caused by a defect in material or workmanship, you could be responsible for the cost of a repair. That's why we need the work order. Becker testified that he understood his claim was subject to the terms of the warranty. Somebody could have dropped some gum in a cylinder for, you know, chewing gum and dropped some gum in a cylinder and caused part of the problem, which could have been revealed and you would not have been a warranty repair. And cylinders could have been. But the fact that you worked on the cylinders two times doesn't in itself prove that there's a breach because, again, it could have been something, it could have been, I mean, I'm not detracting from the evidence here, but that it just, the engine just required an adjustment of some sort. And I will take that one step further, Your Honor, and I will tell you nobody's testified that the cylinders were defective at all. The court came to that conclusion because it said that GNN rejected a guide during the first repair. But nobody testified that it rejected, that they rejected the guide because the guide was defective in workmanship or material. It could have been defective because it was pulled, it was damaged when it was pulled out and sent to GNN. We don't know why they replaced the guide and there's no evidence of it in this record. Well, why don't you move on to your breach argument? Okay. I want to note specifically that there were two factual findings by the court that Continental failed to repair the defective engine or cylinders in a timely manner sufficient to resolve the defective condition and that Continental's acts in attempting to require Becker to execute the work order were grounds for a reasonable conclusion that Continental was no longer treating this as a warranty claim. So my two questions are, what are your best Texas cases that enough time had not elapsed that you can't say as a matter of law or even a factual matter, I guess reverse that, as a matter of law you did not have enough time to repair or replace? We weren't to the point where . . . What's your best case and also what's your best case for saying that when they asked him to sign that mechanics lint thing that that didn't bring everything to a head such that now we're out of the repair, replace option period? With respect to the timing issue, I would say our best case is the in-ray escurant case actually out of this court, which recognizes generally under Texas law if the timing of performance is going to be a material term, the contract has to say it's a material term or there has to be something in the nature and purpose of the contract and the surrounding circumstances to make it a material term. Here far from the contract showing that time was of the essence in fixing it, the warranties actually recognized that it was going to take time to troubleshoot to figure out what a problem was and whether a problem fell within the warranty such that it was caused by a defect in material or workmanship and not something else. And I will tell you, nobody testified that this was taking an inordinate amount of time. In fact, Sherman testified that he thought the progression was as it ought to have been. They trouble, they pulled the cylinders twice, that didn't work. He didn't feel comfortable running the second half of the break-in procedure, so he thought that the next, he agreed with Continental that the next natural step was to ship it to Continental for further troubleshooting. Becker agreed that that seemed like a path forward to solving the problems. Nobody said that that was an inordinate amount of time, and they compared it to the Mercedes case they cite to out of Texas, where that case, the party had brought in their vehicle to be repaired seven times over an eight-month period, and it was repaired wrongly every time. You don't have that time frame here. You don't have any evidence that there were any wrong repairs. We don't know what the problem is. We don't know if it was the cylinders. If anything, the fact that the cylinders were repaired, put in there twice, and didn't solve the problem tells you the problem probably comes from something else. Of course, the glaring thing is not properly breaking in the cylinders, as everybody admits, the break-in procedure was not followed. So with respect to the timing argument- Was it not followed when the plane was first, the engine was first delivered? It was not followed after the cylinders were taken out. Okay, so you had to redo that every time? Yep, we'd do the cylinders, we took them out, the first time it went back, they didn't follow either path. There's a ground run procedure, and there's a test flight procedure. The first time it went back, during the ground run, they didn't cowl the engine. They didn't what? They didn't cowl the engine, they didn't run it while the engine was covered. And they wouldn't run the flight test. The second time they went back, send them the GNN, GNN looks at it and says, they certify them as airworthy twice, the cylinders. They come back the second time, they're still not comfortable test flighting. What evidence is there that they didn't follow the ground procedures the second time? It's actually a fact that the court found it. They did follow the ground procedures the second time? They did not follow the ground procedures either time. That is an undisputed fact, because they didn't feel, the second part of the, oh, the ground procedure? Ground procedures. I'm sorry. I will get you the site that they didn't run the cowling the first time. They followed it the second time. That's what I thought. Yeah, yeah. They followed it the second time. They just wouldn't fly it. Well, I can see why they didn't, actually. The evidence was that while it was running rough during low power, when it powered up high, both Sherman and McClellan agreed that it wasn't running rough anymore. But regardless, Continental didn't push them to fly it. They said, okay, you're not going to fly it, you're not comfortable, send it to us and we will handle the second half. What's your best case that says, as a matter of law, the district court's finding number ninety-three can't stand? What is finding number ninety-three? Ninety-three is when Becker was asked to execute the subject work order. That was grounds for Becker to reasonably conclude that Continental was no longer treating this as a warranty claim and was in breach of the warranty. I don't have a case for it. I don't have a case telling me that by asking somebody to do something consistent with the terms of the warranty, you can be found to have breached that warranty. All the work order was, as he was told, is in case this is not covered. He testified that nobody had told him up to that point that a decision had been made that there was a defect in material or workmanship. And I will point you to the testimony of his expert. When was that request made, to sign the work order? It was made in February 2013, like the 13th or 14th. He never responded to it. He went out and got a lawyer, sent the DTPA letter. As soon as we got the DTPA letter, we picked up the phone and said, look, send us the engine. That was five days after the DTPA letter. I don't know that there's evidence in the record of when we received the DTPA letter. It was five days after they asked him to sign the work order. And he said, look, send us the engine. We won't make you sign the work order. And he still wouldn't sign the engine. What does the record say about why they didn't send the engine? Because they filed suit. But is there anything, do they have any excuse for not sending the engine? They say, you know, we're done here. There's some testimony on the record that he was afraid that they were going to find, come to the conclusion that it wasn't a defect in material and workmanship. And he'd have no way of countering that because they have had, they would have had control. They being us, would have had control of the engine. I can't tell you if that's the reason. That's not a fact finding by the judge. That's just the explanation I remember reading in the record. I would just cite you really quick, just back to the defect, the evidence on it. Sherman could not specifically say what was wrong, could not pinpoint a cause for the problems he reported, and just did not know what the problem was. That's 1167 to 69. And Ronald Piles, there is no smoking gun. Nobody has figured out why the engine was exhibiting the problems it was. And neither he nor anybody else could render an opinion as to whether those problems were caused by a defect in material or workmanship until you knew more about what the problem was. Well you, I mean you keep, you know, you keep seeing extraordinarily high consumption of oil, but then you have oil leaking here, there, and everywhere, out of the plane, through the spark plugs. You know, I mean something, what benign explanation, non-defective explanation can there be for those things? That wasn't the original complaint. The original complaint was just consumption, not stuff dripping out of the tailpipe. That stuff didn't happen until it was returned with the cylinders, and the explanation is the cylinders weren't properly broken in, and the seals didn't take. That's the whole reason why they wanted to do that. But the second time, you admitted that the ground procedures were followed the second time. The ground procedures were. But the flight, the flight portion wasn't, and the flight portion. Well, but there, but there, people on the ground were saying, after we did the ground thing, there was still oil coming out of everywhere, we're not. Because the test flight portion is an integral. Well, who's going to take a flight, a plane up, when there's, and there's evidence I thought that the bangdettos weren't filing correctly. And that is exactly why we said, no problem, we didn't pressure them into filing. Okay, I'm just saying, that's a different, there are two pieces to this. Was there evidence of a defect? The other piece of it is, did you timely offer to repair or replace, and did you do what you're supposed to do, assuming there's a defect? But what defect is that evidence of? You keep saying they didn't take it up. Well, I wouldn't have gotten on the plane the second time. And kind of understood that, which is why they said take the engine out. Right. That's a second, that's a second separate piece. But that's still the defect, that they're only responsible for a defect in material or workmanship, and their own folks said, we can't point to a defect in material or workmanship. With that, thank you. Thank you. All right, Mr. Bayh. Are you the fellow who got the lawsuit started? No, Your Honor. I was not trial counsel. May it please the court, George Vi for the appellee, Mr. Becker. I want to first respond to this argument that was advanced, that what Continental was doing was troubleshooting. It was not troubleshooting. They were processing this warranty claim. When Mr. Becker, who bought a new engine, specifically in reliance on the fact that he would have a warranty with it, because he has to use a Continental engine. That's the engine that's approved for his plane by the FAA. And he has a choice whether to buy a new engine, a reused engine, a rebuilt engine. He chooses a new engine, and he testified that included the fact that there was a warranty. So he's operating a new engine. It only has 336 hours on it, and it's excessively consuming oil. And he is an experienced pilot. We've got this. Okay. And so they're now claiming that what they were doing was troubleshooting. When he reported the excessive oil, Dugash, the company that was working on the plane, bore scope to the engine, saw oil in the combustion chamber, called up Continental, talked to their warranty department, and the warranty department said, file a warranty claim. And he did. Continental told them to pull the cylinders and send it to GNN Aircraft. That was selected by Continental. That's their people. And the evidence was at trial that Continental could no longer work on its own cylinders because it was moving its facility from New York to Alabama. And so it was using GNN Aircraft to do the work that Continental would do itself. And so Continental picked GNN Aircraft and said, send the cylinders there. We've got the facts. All right. And so they also testified that the warranty policy was very, very lenient. That's at the record at page 1470. Their corporate representative testified at trial. Look, it says what it says. I'm sorry, Your Honor? It says what it says. It's a repair or replace warranty. Right. But that their policy, in terms of their complaints now that all we were doing was troubleshooting, we hadn't inspected the engine. We'll spot you that. Okay. So the court was asking about the failure to do, performing the ground test on the second time. So the first time the cylinders were pulled, there was a defect noted. It was in the exhaust guides. Six exhaust guides were repaired. The cylinders were sent back. They were installed by Dugas and the court found, finding a fact 40, the court found that the cylinders were properly reinstalled. The problem worsened the excessive consumption of oil, which is a defect in the engine and prevents it from flying. The excessive consumption of oil became worse. The court so found. And the magistrate found in finding number 42 that the engine was not airworthy after the cylinders were properly reinstalled by Dugas. Continental instructed the cylinders to be sent a second time. Continental instructed GNN Aircraft to rehome the cylinders. The magistrate court found in finding 52 that the proper, that the cylinders were properly reinstalled the second time. And that the engine in finding 53 was not airworthy. It could not be flown. And Judge Owen, it is true in the record that they came up with this ground test and the ground test was performed and it failed. And there's excessive oil. And this was a contested issue at trial. The suggestion in the brief that the clearly erroneous standard doesn't apply because all the facts were not in dispute. They were clearly in dispute. They didn't even agree with the context of the leakage, the blue smoke, how much oil was in the tailpipe, how much oil is in the deck of the facility when these tests. Yeah, but is there any proof that the tailpipe has anything to do with what's going on in the combustion engine? Well, not that the tailpipe had anything to do with it, other than there was evidence of oil, the excess of oil in the combustion chamber was actually in the tailpipe. So there was extensive evidence of it. Although Continental never inspected it, they clearly billed it and treated it as a claim. They also asked Mr. Sherman when he was doing the second installation to photograph it and send the photographs to Continental. Correct me if I'm wrong, but is not the argument you're making that there is a presumption created that after tender and reasonable opportunity to repair, it's almost like a res ipsa argument that there must be a defect, absent, given the history, the factual history, which is in your brief in which you start out with, that there's a presumption at some point, absent some identification of a particular defect, expert testimony or otherwise, that there's a particular defect that after tender so many times that there's almost a presumption that the product is defective that the warranty can be called upon? Yes, there's evidence and that the magistrate judge found there was a preponderance of the evidence that there was a defect both in the engines and the cylinders because they were unable to repair it and the condition actually worsened after the cylinder repair that was authorized. In fact, and of course, we disagree that expert testimony was necessary. We believe lay testimony is appropriate in a UCC claim. The prox cases we think are distinguishable and we think we did that as well in the brief. Mr. Sherman, who testified as a witness and at page 888 of the record, the district court held he was an expert. So we did not have to have expert testimony, but the magistrate judge found he was an expert based on training and experience. He testified that he had eliminated all other possibilities and that there had to be a defect in material or the workmanship and that the workmanship could include the work that GNR had done and aircraft had done as Continental's designated facility. So you have Mr. Sherman who's worked on it, who was found to have properly reinstalled the cylinder, who's doing the testing that's being requested by Continental when it can be done when the aircraft can't be flown. They are involved. He is photographing what he's doing. They're making no protest about that. A presumption arises that there is a defect in the materials or the workmanship. Mr. Becker himself also testified at trial. This is at page 1727 of the record. He said, I know that the engine is defective. It's defective in terms of its materials. It's defective in terms of the workmanship that had been done on it, certainly by GNN and others. I'm not a mechanic, and there's been a lot of postulation that it's the cylinders and this and that, what needs to go in to be repaired. Oil is showing up where it shouldn't be. This is at 1728. It's normal to believe that there's something wrong with the cylinders. That's the first place to look, and I understood that. And then he adds that at that point, and I'll address your question, Judge Owen, about the alleged refusal to send the engine for that part of it. But he also points out that Continental never looked at the engine until 13 months after the lawsuit was filed. Well, if they sent it to somebody who is an authorized repair shop, I mean, Dugas looked at it, right? Dugas looked at it. And they agreed that Dugas was a competent guy. Right, and they picked GNN Aircraft, and GNN Aircraft looked at it. They did the work. So I don't see how you can hold that against Continental. They're trying to repair it. They're trying to repair it, but the repair is unsuccessful. Twice. Never off twice. And Dugas said the next logical step is to send the engine back to Continental. Everybody agreed that was a good point. And Mr. Becker said that was an appropriate step. Now, that's what I want to know. There's a period of time here, it doesn't seem all that long. For some reason, do you have a case that says, as a matter of law, sending the work order that they sent stopped the process, and that's the Continental no longer has the right to either try to repair or replace the engine? I don't have a case. The magistrate judge cited the case, the Southwest Louisiana Hospital Association against BASF. 947 Fed Sub Second 661, Western District of Louisiana, 2013. He cited that in the findings, and he pointed out that in that case, as here, the company had authorized work to be done, it had treated it as a warranty, and then later on it said, well, those were just gestures of goodwill. Here they were saying either it's troubleshooting or that they were just agreeing to do things. Well, they said send the engine back. I'm sorry? They did say send the engine back. They said send the engine back, and Mr. Becker said that sounds like an appropriate thing, and he never did anything other than what Continental told him to do. He was minimally involved. Well, except he hired a lawyer and filed suit. He hired, and he only hired a lawyer and filed suit after they sent him something. I understand that, but his argument is that that notice was consistent with the warranty, and I have a hard time seeing why it wasn't. And let me just add to this, we know from your briefing what an astute and careful man Mr. Becker is, and I'll bet you he could have thought to himself, I can send it back, I can get him to replace it, and if they send me a bill, then I'm going to sue him. Well, what's in the record is that he was willing, he thought, and the magistrate judge, he was reasonable and so thinking, that they had been treating it as a warranty claim all along. They had done the work two times and had never billed him. He says, can I see the work order? He did not say I won't sign a work order. He said, can I see the work order? He made, and his testimony, this is at page 1671 of the record. He calls, on the 29th of January, they said he must sign a work order, and that they might get the engine and determine it wasn't their fault, and they would not be responsible. And you're saying, as a matter of law, that ended it? That Continental was backing away from their warranty, and that they had no further right to repair or replace at that point? They were precluded at that point from saying that it might not be a warranty claim. Why? Because they had, as in the southwestern Louisiana hospital case that the court had cited, because they had engaged in conduct for a number of months in which they'd filed it as a warranty claim, treated it as a warranty claim, paid it as a warranty claim. I don't, I don't, I mean. I don't understand that line of, that may be Louisiana law, but I don't know that that's Texas law about breach of warranty, and I just, the terms of the thing say repair or replace, and I'm looking for this work order, but the work order didn't say this is not covered by the warranty. It just said. What the work order said was. If it's not covered by the warranty, we get, you have to pass. And we're going to impose, and we're imposing a lien on your. If it's not covered by the warranty. If it's not covered. So how's that saying it's not covered? Because in the, because he testified, and his testimony is at, starting at 669 through 674 of the record, he testified that that was the first time that they told him it might not be covered. Okay. Five days later, they say, okay, you don't have to sign the work. All they said was you don't have to sign the work order. They did not retreat from their position that it might not no longer be. How does that, how does that detract from the response duty under the warranty? Because as I said, you know, that GNN might've dropped bubble gum in the, in one of the cylinders accidentally, which would clearly not be a warranty repair, or maybe a, you know, a mouse that got his tail stuck in it or something like that. You know, there, there are circumstances under which repair like that would not have been covered by a warranty. Well, it would be a defect in the workmanship. Well, we don't know. I mean, we don't, we don't know that it could have been the way the plane was. We just don't know. But just saying we're reserving our rights does not mean you're, you're, it's just like an insurance denial letter. If you say we're reserving our rights, that's not a denial of coverage. And that's, that's why I was stressing at the beginning the fact that they testified that their warranty policy was very lenient. The magistrate judge asked their corporate representative trial at page 1470, 1470, does Cottonell require that a part be sent to it to verify a defect? And they said, no, not really. We have a very lenient warranty policy. We sometimes pay warranty claims before we even receive the documentation. So we have months here where they have documented it as a warranty claim. Mr. Becker's not- Why wasn't the plane sent? Five days after they said, okay, you don't have to sign the warranty. Why did they, why did Mr. Becker not go ahead and send the engine and let them do warranty work? One, one, because all they had said was you don't have to sign the form. And of course, the problem with the form is it says you could impose an aircraft mechanics- They said you don't have to sign that. They did not say we agree it's a warranty item. They don't have to say that. I think they did have to say that because of the course of conduct. And that's what the magistrate- Well, give me your best case that says that from Texas law. I do not have a Texas case. Okay, I agree. And, but that was my point is that they did, he did write a letter through a lawyer within a couple of days, it was a DTPA letter. But they have 60 days under the DTPA to offer to do something. The whole point of giving a DTPA letter- What happened after they said- Nothing. Now tell me exactly, I want to know exactly what happened. They did not do a thing. They said you do not have to sign the work order, then what happened? Two days later, he sends the DTPA letter. I thought the DTPA letter went before they said you don't have to- No. Okay, so they said you don't have to sign the work order. Right, two days later, he sent the DTPA letter. So that was after? Yes. The DTPA letter is dated the 14th of February 2013. It's in the record at Exhibit 39 and the testimony is at page 1675 of the record. Did he tell them after he got, after they said you don't have to sign the work order, he said I'm not going to send you the engine? No. What he did was they sent the DTPA letter and then he called, Mr. Becker called the warranty representative for Continental, Roger Gradle, and Mr. Gradle said all further communications must be through counsel. Now, the purpose of the DTPA letter and the 60 days, you can't file suit until you give the DTPA letter. Okay, did counsel call Continental? Did Continental call counsel? I don't have any evidence in the record. I thought there was something about letters exchanged. There were letters exchanged between the attorneys, but the engine sat there. Well, what did those say? Yeah, but at this point, the attorneys are the agents for the parties, so what are the letters saying? I believe, well, I don't want to miscite the record. They're in the record. I can cite the court to Plaintiff's Exhibit 42, which I believe is... Well, in other words, it would make a difference if Mr. Becker's attorney said, I demand, I'm giving you notice under the Texas Deceptive Trade Practices Act, I demand 5,000 attorney's fees and $200,000 to cover the cost of the engine, and so on. Or it would, if he made a hard-nosed demand, or he made a soft demand where he said, I'm representing him, but we just want this aircraft engine fixed as soon as possible. I believe that the exhibit that the court's looking at will be Plaintiff's Exhibit 42. It's in Exhibit Volume 5. I believe the tenor, I can't quote it exactly, I believe the tenor of the letter was that he had incurred some amount of attorney's fees, and let's say it was $1,500 or something like that, and that he did not object to the engine being transferred, but he wanted an acknowledgment by Continental that it would be treated under the warranty as it had through the prior course of trying to fix this problem. So he said, you've got to admit that it's warranty or we're not sending the engine. I don't think that he said we won't send the engine. And the other problem is that Continental knew where it was the whole time. It was with Dugash. They could have, Mr. Becker testified at trial. I never told them they can't get the engine. They could have got the engine, and that's why I was saying to the court, they did not send anybody out to inspect or to look at it. They knew where it was, and it sat there at that facility until November 2013. Let me ask the converse. Did Continental or anyone on its behalf, including counsel, ever say, if you don't sign the form, don't send the engine? We're not interested in looking at the engine. Was it ever conditioned? Well, it was originally. I mean, when they first did it, and the owner... Right, well, I understand that. And he says, no, I don't want to sign the form. And the question, the colloquy here is, what happened after that? And we talked about a series of letters. Did Continental or someone on Continental's behalf ever say, if you don't sign the form, we're not interested in taking the engine or looking at the engine? Well, I don't think they said... I don't think there's anything in the record that they said that. And so my point was that that engine was there and stayed there the whole time. Well, you can't trespass on somebody's property to show up and want to look at the engine. And once a lawyer represents a client, it would be a violation of the ethical code in Texas for Continental to have dealt with Mr. Becker. I understand that. And we're not criticizing for that. So at that point, once a DTPA letter, we have to look at what the lawyer said. And I wasn't suggesting that they could do anything to the... And of course, Mr. Becker didn't know that when he contacted Continental to follow up on the letter and the status and was told, we can't talk anymore. They couldn't talk to him at that point. I understand that. And I'm not criticizing from that point forward. I was just explaining what happened. But they didn't diss Mr. Becker. Once that letter went out, they would have been in serious trouble talking to him without... Again, and I agree, but they also had a 60-day period created by a statute that's intended... And so that's what we need to know. What happened in that 60-day period? I don't know. I mean, I've gone through the record. If I can find something post-trial about that, as I said, and I do want to make this point, in November 2013, they finally sent out their expert to look at it at that facility, at which time that expert borescoped all the cylinders. He then ran the engine run. He then performed another borescope examination and found there was increased oil in one side of the engine, on the 135 side. And he, at that time, recommended that they replace all the cylinders, a top overhaul kit to correct the oil consumption issue, and even then, Continental still did not follow that recommendation. Now, I understand it's in litigation, but that kind of works both ways. I mean, they can't claim the benefit of being in the litigation and criticize us for what we're not doing during the litigation. The courts questioned, Your Honor, about a Texas case on the time is of the essence argument, that not enough time had gone by. The magistrate judge found that they had never offered to replace the engine. They had never offered to replace the cylinders. Their argument is that it had been not enough time, and that time has to be of the essence. I cannot find a single warranty case in which someone writes a warranty with a time is of the essence provision. A time is of the essence. Well, I'll tell you where an example would be. If Mr. Becker were a commercial pilot, and he owned his own craft, and he hauled people or things around, and he needed to have it repaired quickly, then he would put in a time is of the essence. And we know that he's an extraordinarily careful individual. So in a commercial transaction, you can certainly contemplate that possibility. This is a consumer transaction. He's a consumer. The warranty is a contract of adhesion. A warranty, there's nothing in Texas law that says a warranty is a contract of adhesion, per se. And this is a sophisticated contract between sophisticated people. We believe that the evidence under clearly erroneous standard was sufficient to support all the magistrate judge's findings, including that there had been enough time and enough repair efforts that they should have offered to replace the engine, did not do so. That was the only compensation that he received. Other attorneys' fees was the cost of a new engine. The court did not find it was knowing. The court did not find that we were entitled to additional damages. The court did not give us a loss of use. He awarded us for the cost of engine. We think that the evidence supported that, and we would ask the court to affirm. Okay, Mr. Santopo. Respect to payment of the troubleshooting costs. In the warranties, TCM will pay for troubleshooting costs associated with identifying the need for such repairs or replacements when coordinated through an authorized TCM representative. They were required under the terms of the warranty to pay for troubleshooting costs. What happened during the 60 days after the DTPA notice went out? In the 60 days after the DTPA notice went out? Yeah, all right, the counsel just told us that Continental told before the DTPA letter says you don't have to sign the work order. Did they say send the engine? They said send the engine, that they made repeated offers. Okay, the DTPA letter goes out, then what happens? Then we say, you know, we still offer, and I believe this is in the record. Yeah, we need to know what happened. In settlement negotiation. This is in findings 63 through 68 of page 9 of the, and that's all, you know, and all it says is what has been told us before, which is that the work order was provided on February 18th, he retained an attorney who sent a demand letter on February 19th. Gradle requested that the engine be shipped, and Becker did not send the engine. Those are the findings of fact. You know, I think, were there conversations between the attorneys from that point on? I believe there were, but the case took its course down the litigation road instead of the fixing the problem road, and that's what led to McClellan not going out and looking at the aircraft for 14 months. Finding 69 is a continental following receipt of the letter instructed Dugas not to touch the engine further. That's right, and then they contacted Becker and said, you don't have to sign the work order, and they were told, don't contact Mr. Becker anymore. All communications come through lawyers. Now, let me ask you one question about this work order, though, because the work order doesn't say, you know, it doesn't really specify whether it's warranty or not. In fact, what it says is, I authorize the following services or repair work, and hereby grant you and your employees permission to operate and fly the aircraft, and express mechanics lien is hereby acknowledged on above aircraft to serve, secure the amount of service and or repairs. The testimony was that's just their standard form work order that they asked them to sign, and they told him when they did that it's in case the repairs are not covered by the warranty, you could be responsible. So it's not the, is the work order in the record? I believe the work order is in the record. Certainly think it ought to be, and does the work order say for warranty repair or what? At that point, there was no really, I mean, they were still troubleshooting, but there wasn't a warranty determination. It wasn't a warranty repair yet, because nobody had determined whether it was a defect in material or workmanship at that point, and nobody has figured that out as we sit here today. Where's the engine today? Counsel could maybe answer that. As far as I know, it may still be at either Dugash. It's under counsel's control, Mr. Becker's control. So, all right. The Southwest Louisiana case, and I had talked about the troubleshooting costs for this reason. The holding in the Southwest Louisiana case was because, quote unquote, the behavior, the party who was trying, who had the duty to repair, their behavior was, quote unquote, inconsistent with the written terms of the limited warranty. Paying for troubleshooting costs in this case is not inconsistent with the written warranty. Where is there anything in the record that says that Continental was paying GNN or Dugash for troubleshooting? Nobody specifically said troubleshooting. You get there by the fact that nobody said it was covered, and in fact, I think Mr. Sherman testified. Nobody ever told him that it was absolutely covered under the warranty, and that comes from the fact that until you know whether or not the problem results from a defect in workmanship, you don't know whether it's covered by the warranty. You can't make that call, and again, I would cite the court to Mr. Pyle's testimony that said neither he nor anybody else, until you inspect that engine further, can tell you whether or not the defect comes from something in material in workmanship or something else, and that has not been done to this day. Is it clear from the record that Continental said you don't have to sign the work order before the DTPA letter was sent? I don't know that. No, I don't think that's clear that they said that before the DTPA letter was sent, and the timing of it was after it was sent. Okay, I got conflicting things. I just wasn't sure what the record was. And again, we would submit that the asking him to sign the work order isn't at all inconsistent with the terms of the warranty, and I don't know how asking someone to do something that is consistent with the terms of the work order— Well, this doesn't say a thing about if it's not covered by warranty. This makes it sound like you're going to have to pay for it. But as he was told, that was just in case there was something that wasn't repaired, and that was his understanding of it. And that's in the record. Okay. Thank you, Your Honors. All right, thank you. That concludes the oral arguments of today. We'll take these cases under advisement. They're both very interesting.